IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARGARET K. HILL, Trustee of Kelk      )
Irrevocable Trust, on behalf of        )
herself and all others similarly       )
situated,                              )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )      No. 05 C 2602
                                       )
THE TRIBUNE COMPANY, DENNIS J.         )
FITZSIMONS, DONALD C. GRENESKO,        )
and JACK FULLER,                       )
                                       )
            Defendants.                )
_____)
                                       )
THOMAS F. MURRAY, individually and     )
on behalf of a class of similarly      )
situated Plan participants,            )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )      No. 05 C 2927
                                       )
                                       )
THE TRIBUNE COMPANY, DENNIS J.         )
FITZSIMONS, JOHN W. MADIGAN,           )
DONALD C. GRENESKO, CHANDLER           )
BIGELOW, DAVID J. GRANAT, TRIBUNE      )
COMPANY EMPLOYEES BENEFITS             )
COMMITTEE, GERALD W. AGEMA,            )
JEFFREY CHANDLER, JOHN DOES 1-30,      )
FIDELITY MANAGEMENT TRUST COMPANY,     )
ROGER GOODAN, MARK M. HARRIS,          )
ENRIQUE HERNANDEZ, BETSY HOLDEN,       )
BRIGID E. KENNEY, THOMAS D. LEACH,     )
LUIS E. LEWIN, ROBERT MORRISON,        )
RUTHELLYN MUSLIN, WILLIAM OSBORN,      )
J. CHRISTOPHER REYES, IRENE M.F.       )
SEWELL, WILLIAM STINEHART,             )
DUDLEY TAFT, KATHRYN TURNER,           )

VANGUARD FIDUCIARY TRUST COMPANY )
and MILES D. WHITE, )
)
Defendants. )
)
_____ )
)
CITY OF PHILADELPHIA BOARD OF )
PENSIONS AND RETIREMENT, individually )
and on behalf of all others similarly )
situated, )
)
Plaintiffs, )
v. ) No. 06 C 0741
)
THE TRIBUNE COMPANY, LOUIS SITO, )
and RAYMOND JANSEN, )
)
Defendants. )

## **MEMORANDUM OPINION AND ORDER**

Before the court are three cases involving investments in
the stock of defendant The Tribune Company ("Tribune"). Two of
the cases are brought by a Tribune stock holder. These
"Securities Cases" allege federal securities fraud claims
governed by the Private Securities Litigation Reform Act of 1995
("PSLRA"). The other case is brought by participants in Tribune
pension plans holding Tribune shares in their accounts during the
pertinent time period. This "ERISA Case" alleges violations of
the Employee Retirement Income Security Act of 1974 ("ERISA").
In each case, overstatements regarding the circulation of two
newspapers (Newsday and Hoy) operated by Tribune subsidiaries,

- 2 -

and a drop in Tribune share prices following disclosure of the
overstatements of circulation are alleged. Most of the named
defendants are management officials at Tribune who were not
directly involved in the overstatements of circulation. The two
types of cases are here originally for purposes of coordinated
discovery. Motions to dismiss are pending in each case.

Pursuant to the PSLRA, the court appointed the City of
Philadelphia Board of Pension and Retirement ("CPBPR") as lead
plaintiff in the Securities Cases and also appointed lead
counsel. See Hill v. The Tribune Co., 2005 WL 3299144 (N.D. Ill.
Oct. 13, 2005). As required by court order, a Consolidated
Amended Class Action Complaint was filed in the Securities Cases
(the "CAC").[1] Subsequently, lead plaintiff filed a separate
action against two defendants who had not been named in the CAC,
CPBPR v. Tribune Co., No. 06 C 741 (the "741 case"). Lead
plaintiff, in an abundance of caution, filed the 741 case instead
of first seeking to amend the CAC because the statute of
limitations for adding the two new defendants potentially was
about to expire. Shortly after filing the 741 case, lead
plaintiff moved to consolidate the 741 case into the Hill case

---

[1]Because it was the lowest numbered case of the original
three Securities Cases that had been filed, the CAC was filed in
the Hill case, which retained its original caption even though
Margaret Hill is no longer the named plaintiff. The other two
cases were dismissed without prejudice. See Hill, 2005 WL
3299144 at *3, 5.

and to amend the CAC. The proposed Second Amended Consolidated Class Action Complaint ("SAC") adds the two new defendants, including allegations about their backgrounds and connection to the case. It also adds some additional allegations regarding the overstatement of circulation and deletes an erroneous allegation about when certain arrests occurred. While defendants contend both the CAC and SAC should be dismissed for failing to adequately allege security law claims, there is no objection to consolidating the cases, which is what the PSLRA requires. Therefore, the 741 case will be dismissed without prejudice and lead plaintiff will be granted leave to file the SAC in the Hill case. The pending motions to dismiss in the Securities Cases will be treated as applying to the SAC. The motion to dismiss filed in the 741 case will be considered as if it had been filed in the Hill case. In accordance with the PSLRA, no discovery has been permitted while the motions to dismiss have been pending.

The PSLRA does not apply to the ERISA case. Although the plaintiffs in the five ERISA cases that had been pending had requested appointment of a lead plaintiff, no such appointment was made because, unlike the PSLRA, Fed. R. Civ. P. 23 has no provision for appointment of a lead plaintiff. Hill, 2005 WL 3299144 at *3. In accordance with Fed. R. Civ. P. 23(g), interim counsel was appointed for the ERISA Cases. Id. at *3-5. A Consolidated Amended ERISA Complaint ("CAEC") was filed in the

lowest numbered ERISA Case, Murray v. The Tribune Co., No. 05 C 2927, and the other four ERISA cases were dismissed without prejudice. The CAEC has two named plaintiffs, Kenneth Pugh and Chad Boylan. All defendants in the ERISA Case have moved to dismiss the CAEC in that case.

Different pleading standards apply to the two types of cases. The motions to dismiss the Securities Case will be considered first. Although some of the Securities Case defendants have not expressly joined in the motions to dismiss, to the extent any argument is applicable to another defendant, it will be considered as to all applicable defendants.

## I. SECURITIES CASE

### A. Defendants and Claims

Named as defendants in the SAC are the Tribune, Dennis FitzSimons, Donald Grenesko, Jack Fuller, John Madigan, Robert Brennan, Richard Czark, Robert Garcia, Louis Sito, and Raymond Jansen. The SAC describes each defendant as follows. Tribune is a media and entertainment company engaged in newspaper publishing, television, radio, and entertainment. The publishing segment includes at least 11 daily newspapers and represents approximately "70% of Tribune's total business." SAC ¶ 17. FitzSimons has been Tribune's Chairman, President, and Chief Executive Officer since January 2003. From July 2001 through December 2002, he was its President and Chief Operating Officer.

Grenesko is Senior Vice President, Finance and Administration, which makes him Tribune's Chief Financial Officer. Fuller was President of Tribune Publishing Company. Madigan was Chairman and Chief Executive Officer of Tribune from July 2001 through December 2002.[2]

Brennan was Newsday's Vice President for Circulation until placed on administrative leave in June 2004. Czark was Hoy's National Circulation Manager. Garcia was a sales and distribution manager for Hoy. Sito was Newsday's Vice President for Circulation until replaced by Brennan. Also, Sito was President, Publisher, and Chief Executive of Hoy; President and Chief Executive Officer of DSA Community Publishing; and Vice President for Hispanic Media at Tribune until his retirement in July 2004. Sito signed false circulation audits for Hoy that were reported to the Audit Bureau of Circulations ("ABC"). Jansen was the Publisher of Newsday from 1994 until he retired in July 2004. On behalf of Newsday, Jansen signed circulation audits containing false numbers which were reported to ABC.[3] The putative plaintiff class consists of persons who purchased

[2]FitzSimons, Grenesko, Fuller, and Madigan will be collectively referred to as the "Tribune Individual Defendants."

[3]Brennan, Czark, Garcia, Sito, and Jansen will be collectively referred to as the Newsday-Hoy Individual Defendants.

Tribune common stock between January 24, 2002 and September 10, 2004.

The SAC contains two claims. The First Claim is against all defendants for violation of § 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5). In the Second Claim all the individual defendants (that is, all defendants except Tribune) are alleged to be liable as controlling persons of the Tribune under § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). Also in the Second Claim, FitzSimons, Grenesko, Fuller, and Madigan are claimed to be controlling persons of Brennan, Czark, Garcia, Sito, and Jansen.[4]

---

[4]Brennan, Czark, and Garcia were named in the CAC, but have not appeared. Defendants have requested that default judgments be entered against them. Sito and Jansen were the two new defendants named in the 741 case. Tribune was also named in the 741 case. At the time that the 741 case was reassigned, the motion to dismiss in Hill was already fully briefed. An agreed motion was filed in the 741 case requesting that defendants not be required to answer or otherwise plead in the 741 case since there was a pending motion to consolidate and a pending motion to dismiss the Hill case. The agreed motion was granted. At a subsequent hearing, however, defendant Sito indicated he might have contentions different from those raised in the Hill motion to dismiss. Sito was then ordered to indicate whether he joined in the previously briefed motion and to raise any additional contentions in a separate motion. Additional briefs were taken on the issues raised by Sito. Jansen has never indicated he has any distinct issues to raise and his attorney did not file an appearance until after Sito's motion was fully briefed.

## B. Pleading Standards

Because fraud is alleged, Fed. R. Civ. P. 9(b)'s requirement of particularized pleading applies to the SAC. Ordinarily, under Rule 9(b), state of mind may be pleaded generally. The PSLRA, however, imposes more stringent pleading requirements than Rule 9(b). In addition to the requirements of Rule 9(b), the PSLRA requires that a complaint of securities fraud (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed" and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1), (2); <u>Makor Issues & Rights, Ltd. v. Tellabs, Inc.</u>, 437 F.3d 588, 594 (7th Cir. 2006). It is the latter requirement that is at issue: whether lead plaintiff has adequately pleaded that defendants acted with the necessary scienter or state of mind. The SAC must contain sufficient factual allegations "to convince a court at the outset that the defendants likely intended 'to deceive, manipulate, or defraud'" the investing public. <u>Id.</u> at 594-95 (quoting <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 n.12 (1976)). Even under the PSLRA, at the pleading stage the plaintiff need only provide

sufficient factual allegations; it is not necessary to establish or prove any facts, nor submit evidence in any form. See Simpson v. Nickel, 450 F.3d 303, 306 (7th Cir. 2006).

The PSLRA did not change the scienter requirement for a § 10(b) violation. Tellabs, 437 F.3d at 600. The standard is still a "mental state embracing intent to deceive, manipulate, or defraud." Ernst, 425 U.S. at 193 n.12. Accord Tellabs, 437 F.3d at 595. That standard includes "reckless disregard of the truth," SEC v. Jakubowski, 150 F.3d 675, 681 (7th Cir. 1998), cert. denied, 525 U.S. 1103 (1999), which "may be defined as a highly unreasonable omission, involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033, 1045 (7th Cir.), cert. denied, 434 U.S. 875 (1977). Accord Tellabs, 437 F.3d at 600.

Although not changing the scienter standard itself, the PSLRA now requires that it be pleaded with sufficient facts to create a "strong inference" of scienter. The circuit courts have offered differing constructions of the strong inference requirement. While the pending motions were being briefed, Tellabs was issued, in which, for the first time, the Seventh

Circuit addressed PSLRA pleading requirements.[5]  The Seventh
Circuit adopted the "middle ground" approach that had been
adopted by six other circuits.

> The text of the statute states only that the
> complaint must support "a strong inference" of
> scienter.  Without more detailed instruction, we
> conclude that the best approach is for courts to
> examine all of the allegations in the complaint
> and then to decide whether collectively they
> establish such an inference.  Motive and
> opportunity may be useful indicators, but nowhere
> in the statute does it say that they are either
> necessary or sufficient.

Tellabs, 437 F.3d at 601.

Regarding inferences to be drawn from the facts that are
alleged, the Seventh Circuit stated:

> Instead of accepting only the most plausible of
> competing inferences as sufficient at the
> pleading stage, we will allow the complaint to
> survive if it alleges facts from which, if true,
> a reasonable person could infer that the
> defendant acted with the required intent.  "Faced
> with two seemingly equally strong inferences, one
> favoring the plaintiff and one favoring the
> defendant, it is inappropriate for us to make a
> determination as to which inference will
> ultimately prevail, lest we invade the
> traditional role of the factfinder."
> Pirraglia v. Novell, Inc., 339 F.3d 1182, 1188
> (10th Cir. 2003).  "Scienter is normally a

---

[5]Tellabs was issued two days before lead plaintiff filed
its answer to the Hill motion to dismiss.  Lead plaintiff did not
cite Tellabs in its brief, but did rely on many cases that are
consistent with Tellabs.  It also relied on some cases that are
inconsistent with Tellabs.  Defendants relied on Tellabs in their
reply filed in Hill.  Lead plaintiff's answer brief to Sito's
motion to dismiss was filed well after Tellabs was decided.  In
that brief, lead plaintiff does not mention Tellabs.

factual question to be decided by a jury, but the complaint must at least provide a factual basis for its scienter allegations." [In re] Cerner Corp. [Securities Litigation], 425 F.3d [1079,] 1084-85 [(8th Cir. 2005)]. If a reasonable person could not draw such an inference from the alleged facts, the defendants are entitled to dismissal; the complaint would fail as a matter of law to meet the requirements of § 78u-4(b)(2). See Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1105 (10th Cir. 2003) ("We [ ] understand a 'strong inference' of scienter to be a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading.").

Id. at 602.

The Seventh Circuit rejected the group pleading presumption. There must be a strong inference of scienter regarding each defendant.

> The so-called "group pleading presumption" is "premised on the assumption that in cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the officers." [City of Monroe Employees Retirement System v.] Bridgestone Corp., 399 F.3d [651,] 689 [(6th Cir. 2005)]. . . . The answer, in our view, lies in the language of the statute. Section 78u-4(b)(2) requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." As the Fifth Circuit recently held, "PSLRA references to 'the defendant' may only reasonably be understood to mean 'each defendant' in multiple defendant cases, as it is inconceivable that Congress intended liability of any defendants to depend on whether they were all sued in a single action or were each sued alone in several separate

- 11 -

actions." Southland [Sec. Corp. v. Inspire Ins.
Solutions, Inc.], 365 F.3d [353,] 365-66 [(5th
Cir.2004)]. See also Phillips v. Scientific-
Atlanta, Inc., 374 F.3d 1015, 1018 (11th Cir.
2004) ("[W]e believe that the most plausible
reading in light of congressional intent is
that a plaintiff, to proceed beyond the
pleading stage, must allege facts sufficiently
demonstrating each defendant's state of mind
regarding his or her alleged violations."). We
find this reasoning persuasive. While we will
aggregate the allegations in the complaint to
determine whether it creates a strong inference
of scienter, plaintiffs must create this
inference with respect to each individual
defendant in multiple defendant cases.

Id. at 602-03.

## C. Facts Alleged

With these standards in mind, the allegations supporting

scienter must be considered. At least as early as 2001, Newsday

and Hoy overstated their paid circulation. Under standards set

by ABC, an independent non-profit monitoring service,

distribution of a newspaper does not count as paid circulation

unless the newspaper is sold for at least 25% of its basic single

copy price. Schemes that were employed to overstate paid

circulation included phony hawking programs, false affidavits

that understated returns and overstated net sales, and directions

to subordinates to pay distributors for bogus deliveries of

newspapers. Many copies of the two papers were dumped or

delivered to persons who had no paid subscriptions. The SAC

contains allegations as to Brennan's, Czark's, Garcia's, Sito's,

and Jansen's direct involvement in and actual knowledge of these schemes.

The limited allegations regarding Jansen are conclusory. They are insufficient to strongly infer his actual knowledge or reckless disregard regarding the circulation numbers. Sito disputes whether his scienter regarding the circulation numbers is adequately alleged. In light of the report that Sito recently pleaded guilty to mail fraud related to the circulation numbers, an amended complaint may be able to easily allege facts supporting Sito's knowledge or reckless disregard. For present purposes, it will be assumed that lead plaintiff has adequately alleged Sito's direct involvement in and actual knowledge of the inflation of circulation numbers for Hoy.

The overstated paid circulation numbers resulted in Newsday and Hoy charging higher advertising rates than would have been charged without the inflated circulation numbers. After the overstated circulation numbers were revealed, Tribune recorded a $90,000,000 charge against earnings representing amounts expected to be refunded to advertisers. The inflated advertising rates being charged prior to the disclosure allegedly resulted in a higher price for Tribune stock. Tribune's stock price allegedly dropped as a result of the disclosure of overstated circulation numbers and the charge against earnings.

As summarized in the SAC, the facts allegedly concealed
from the investing public during the class period were:

> (a) since at least FY 2001, defendants were
> fraudulently inflating the circulation of
> Tribune's Newsday and Hoy publications, thus
> generating ill-gotten revenue from their
> advertisers;
> (b) as a result of the inflated circulation
> figures, the Company's publicly reported
> financial results during the Class Period were
> artificially inflated (including revenue,
> earnings, and growth figures) and the Company's
> liabilities were understated;
> (c) defendants had intentionally or
> recklessly established extremely weak circulation
> controls which allowed for the circulation
> overstatements to go on unchecked for the better
> part of three years;
> (d) the true circulation of Newsday was only
> 480,000-490,000 copies of the weekday paper and
> 540,000-550,000 of Sunday's editions, or roughly
> 80% of what had been previously reported;
> (e) the true circulation of Hoy was only
> 40,000 to 50,000 copies, or roughly half of what
> had been previously reported; and
> (f) as a result of (a)-(e) above,
> defendants' ability to continue to achieve
> future earnings per share and revenue growth
> would be severely threatened, and would and did
> result in a $90 million charge against earnings.

SAC ¶ 12.

The false statements were contained in press releases and
SEC filings. The press releases alleged in the SAC were issued
from October 25, 2001 through April 15, 2004. The press releases
contained false statements of the type summarized above in that
they contained statements about Newsday or Hoy circulation for
particular time periods, Tribune income and earnings for

particular time periods, and/or statements about Tribune advertising revenues. No individual defendant is alleged to be directly responsible for issuing any of the press releases, but FitzSimons is quoted in a number of the press releases and Madigan is quoted in one. In February 2004, and thereafter, advertisers filed lawsuits alleging Newsday and Hoy had overstated circulation. Tribune initially denied the allegations. The forceful denial allegedly prevented the stock price of Tribune from falling at that time. On February 11, 2004, Tribune issued a press release stating:

> Newsday publisher Raymond Jansen issued the following statement today regarding [sic] lawsuit filed yesterday against the newspaper and the Spanish-language newspaper Hoy:
> "The lawsuit filed yesterday against Newsday and Hoy is completely without merit.
> The allegations contained in the lawsuit are false. The source of the allegations is a disgruntled former employee who was a principal of a bankrupt distribution company that was an affiliate of Newsday, bought in 1998.
> The allegations involve less than 1% of Newsday's total circulation, and less than 15% of Hoy's total circulation.
> The Audit Bureau of Circulations conducts annual audits of Newsday and Hoy. The last one was done in 2003, and we are scheduled for another in 2004.
> As the lawsuit is without merit and the allegations it contains false, we will not comment further at this time."

SAC ¶ 100.

The SEC filings that allegedly contained false statements are annual Forms 10-K for the years 2001 through 2003 and

quarterly Forms 10-Q for the first quarter of 2002 through the first quarter of 2004. The SEC filings contained false statements of the type summarized above reporting Tribune's income and earnings, reports of Newsday's circulation, representations about internal controls, and statements about Tribune advertising revenue.

The 2003 Form 10-K included an announcement of a Code of Ethics for CEO and Senior Financial Officers that had been adopted effective May 6, 2003.

Madigan, FitzSimons, Fuller, and Grenesko signed the annual Form 10-K's, except that Madigan did not sign the one for 2003. Except for the Form 10-K for 2001, the SEC filings contained certifications required by the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7241. Each of the Sarbanes-Oxley certifications is signed by Grenesko and either Madigan or FitzSimons.

The SEC began an informal investigation in February 2004. In March 2004, the United States Attorney for the Eastern District of New York began a criminal investigation. Prior to June 2004, the United States Attorney for Connecticut and the Connecticut Attorney General began investigations. The allegations regarding these inquiries are not specific, but it is implied that Tribune was aware of all of the investigations prior to June 2004. See SAC ¶¶ 6-7.

In early June 2004, there were reports of a decrease in advertising sales for Tribune holdings. At that point, the price of Tribune shares began to fall. In June 2004, Tribune backed off its position that the advertisers' lawsuits were completely without merit, placed Brennan on administrative leave, and partially disclosed the circulation fraud. In a June 17, 2004 press release issued by Newsday, it was stated that September 2003 circulation for Newsday was overstated by approximately 40,000 daily and 60,000 on Sundays. It was stated that Hoy circulation was overstated by approximately 15,000 daily and 3,000 on Sundays. It was also stated that both publications "expect to make significantly smaller adjustments to their March 2004 circulation figures." SAC ¶ 115.

In a July 14, 2004 press release announcing second quarter results, Tribune stated that an investigation had revealed further adjustments would be made to the September 2003 and March 2004 circulation figures for Newsday and Hoy, and that there were also misstatements for 2001 and 2002. It was also noted that the second quarter results included a $35,000,000 charge related to an anticipated settlement of the advertisers' lawsuits. FitzSimons is quoted as stating that "we moved aggressively to address circulation misstatements at Newsday and Hoy." SAC ¶ 119.

In a July 28, 2004 article in the financial press, it was reported that Newsday had lowered its guaranteed circulation numbers by 55,000 daily and 100,000 for Sundays and that advertising rates would be cut.

On July 30, 2004, Tribune filed its second quarter 2004 Form 10-Q. In the Form 10-Q, Tribune reiterated the results stated in the July 14, 2004 press release, including the $35,000,000 charge related to the advertisers' lawsuits. It was also stated that Tribune would continue to vigorously defend the lawsuits and continue to evaluate the adequacy of the $35,000,000 reserve. As had been reported in the press, it was noted that Newsday and Hoy had been censured by ABC. It was also noted that the SEC, the United States Attorney, and the Nassau County District Attorney were investigating and that Tribune was cooperating with those investigations.

In a September 10, 2004 press release, which coincides with the ending date of the putative class period, Tribune disclosed the true circulation numbers. It was also stated that the cost to settle the advertisers' lawsuits would increase by $45-60,000,000 and that the additional charge would be included in third quarter results.

## D. Newsday-Hoy Individual Defendants

Sito is the only one of the Newsday-Hoy Individual Defendants who has expressly moved for dismissal. Arguments he

raises, however, also apply to Jansen, Brennan, Czark, and Garcia. One of Sito's contentions is that he cannot be liable for securities fraud because he was not responsible for issuing any of the press releases or SEC filings containing the alleged false representations. Lead plaintiff responds that Sito knowingly signed false circulation audits for Hoy that were submitted to ABC. The same is alleged regarding Jansen and Newsday circulation audits. The allegations are insufficient to support Jansen's knowledge or reckless disregard of the inflated circulation numbers. Lead plaintiff contends the submissions to ABC were public statements upon which liability may be based.

It need not be considered whether submissions to ABC constitute public statements upon which a securities fraud claim may be based. The PSLRA requires that each statement alleged to be misleading be specified in the complaint. 15 U.S.C. § 78u-4(b)(1); Tellabs, 437 F.3d at 594. The misleading statements upon which lead plaintiff's claims are based are alleged in the section of the SAC entitled "False and Misleading Statements," SAC ¶¶ 60-112, with some additional misleading statements also included in the section entitled "The Truth Begins to Emerge," see id. ¶¶ 115-16, 119-20, 124-25. The misleading statements that are identified are all press releases[6]

---

[6]All the press releases are Tribune press releases except for the June 17, 2004 press release which is identified as a Newsday press release. Jansen was still the publisher of Newsday

or SEC filings. The Newsday-Hoy Individual Defendants did not sign any of the SEC filings nor are they alleged to have been directly involved in preparing any of those filings or issuing or preparing any of the press releases.[7] Since the circulation audits submitted to ABC are not themselves specifically identified as misleading statements upon which the securities fraud claims are based, Sito's and Jansen's liability cannot be directly based on submitting the audits to ABC.

Lead plaintiff contends that, even if the circulation audits are not considered to be public statements, Sito can still be liable because he participated in the scheme to defraud and there is no requirement that a participant in a securities fraud scheme himself make any public statements. Lead plaintiff cites In re Lernout & Hauspie Securities Litigation, 236 F. Supp. 2d 161, 173 (D. Mass. 2003), for the proposition that "the better reading of § 10(b) and Rule 10b-5 is that they impose primary liability on any person who substantially participates in a

_____

at that time and is quoted in the press release, but it is not specifically alleged that he was responsible for issuing the press release. Instead, it is indicated that Tribune was actually responsible for issuing the press release. The revised circulation figures contained in the press release are not attributed to Jansen. See SAC ¶ 115.

[7]The one limited exception is that the February 11, 2004 press release from Tribune contains a lengthy quote of a statement given by Jansen. Even taking this as a statement by Jansen upon which § 10(b) liability could be based, as previously stated, there is no adequate basis for strongly inferring Jansen's scienter.

manipulative or deceptive scheme by directly or indirectly employing a manipulative or deceptive device (like the creation or financing of a sham entity) intended to mislead investors, even if a material misstatement by another person creates the nexus between the scheme and the securities market." In the present case, it is unnecessary to determine the full parameters of indirect conduct. A key problem with lead plaintiff's contention is that the allegations as to Sito and the other Newsday-Hoy Individual Defendants only support, at most, that they were inflating circulation numbers in order to charge higher advertising rates that would increase revenues for their publication. There are no allegations to support that these defendants had any intentions regarding deceiving the investing public. Without any allegations connecting these defendants to the allegedly misleading press releases and SEC filings, cf. Higginbotham v. Baxter International, Inc., 2005 WL 1272271 *6 (N.D. Ill. May 25, 2005), nor any specific allegations from which it may be strongly inferred that these defendants were working with Tribune executives to prop up the value of Tribune stock, lead plaintiff does not satisfy the scienter pleading requirement for these defendants. Notably, the section of the SAC entitled "Scienter" makes no express allegation regarding any of the Newsday-Hoy Individual Defendants. See SAC ¶¶ 133-51. Allegations about knowledge that the Newsday-Hoy Individual

- 21 -

Defendants had is limited to allegations that they directly and knowingly participated in the inflation of circulation numbers.

In its answer to Sito's motion, lead plaintiff bases additional allegations on a May 30, 2006 United States Attorney press release reporting guilty pleas by nine former Newsday and Hoy employees, including Sito, Brennan, Czark, and Garcia, but not Jansen. "Ordinarily, as long as they are consistent with the allegations of the complaint, a plaintiff may asset additional allegations in its response to a motion to dismiss. However, Rule 9(b) requires the necessary allegations be in the complaint itself. Additional allegations contained in the responsive brief, however, may indicate that plaintiff should be given the opportunity to amend the Complaint to comply with Rule 9(b)." Guaranty Residential Lending, Inc. v. International Mortgage Center, Inc., 305 F. Supp. 2d 846, 852 (N.D. Ill. 2004) (citations omitted). However, taking into consideration the additional allegations would not change today's ruling.

The First Claim against defendants Brennan, Czark, Garcia, Sito, and Jansen will be dismissed.

## E. Tribune Individual Defendants

As to the Tribune Individual Defendants, lead plaintiff alleges that the allegations sufficiently support at least reckless disregard of the truth. It contends that discrepancies between actual revenues and the reported paid circulation would

- 22 -

have put the Tribune Individual Defendants on notice of problems with reported circulation. It also contends that the circulation controls in place were so obviously weak that the Tribune Individual Defendants would have known they were deficient. Additionally, lead plaintiff points to bonuses for FitzSimons and Madigan[8] which were based in part on increases in cash flow and stock options all four Tribune Individual Defendants exercised during the putative class period.

Regarding the discrepancies between reported circulation and revenue, lead plaintiff alleges:

> Verifying the accuracy of the sales claims would have been a relatively easy task since Tribune was entitled to revenue for every issue sold. Revenues received from third-party newspaper vendors should have matched precisely with the number of issues each vendor claimed to have sold. However, when the papers were discarded, rather than sold, there was no revenue. Thus, defendants knew or were reckless in not knowing that the sales revenues received from vendors did not support the circulation figures being reported to the Audit Bureau of Circulations.

SAC ¶ 134. There are no further allegations detailing this conclusory allegation.

---

[8]Allegations refer to bonuses for "executives and other key employees." SAC ¶ 139 (quoting April 7, 2003 Proxy Statement). However, only FitzSimons and Madigan are specifically alleged to have received such bonuses. SAC ¶¶ 139-42.

As defendants point out, it is also alleged that ABC includes in paid circulation any paper sold for at least 25% of the single copy price. SAC ¶¶ 43-44. While that would mean there is not a direct correlation between paid circulation and newspaper sales revenue, perhaps having general information about available discount programs would reveal a discrepancy between reported paid circulation and actual revenues. The problem is that the PSLRA does not permit that type of speculation when determining whether a strong inference of scienter has been alleged. Also, there are no allegations regarding what structures are in place at Tribune itself for reviewing revenue reports from the various newspapers it owns nor the line of authority. The allegations regarding discrepancies between reported paid circulation and revenue from selling newspapers are not a basis for inferring that the Tribune Individual Defendants should have known paid circulation was overstated.

The allegations as to deficient internal controls are also conclusory. There are no allegations as to the controls that were in place nor what could have been done differently. Instead, lead plaintiff simply alleges methods that were used to inflate circulation and contends internal controls must have been deficient because the fraudulent overstatements were not discovered. Just as overstatements of income or revenue are not by themselves enough to infer scienter, see Higginbotham,

2005 WL 1272271 at *7 (collecting cases), failure to discover overstated newspaper circulation is not enough, by itself, to infer scienter. There should also be allegations as to what controls were actually in place and what controls should have been in place.

It is alleged that: "The inability of Tribune's internal auditors to confirm circulation from these fictitious hawkers, as described in the Briggs affidavit, should have raised red flags about both circulation and revenue." SAC ¶ 135. Allegations based on the Briggs affidavit are contained in paragraphs 34-59 of the SAC (see SAC ¶ 33). The only reference to Tribune auditors is contained in ¶ 57 which alleges:

> In 2003 [a Chicago distributor of Hoy] met with Czark and [consultant Ed] Smith to discuss what he/she should say to Tribune auditors who were reviewing the paid circulation that the distributor had reported relating to his work in Chicago. The distributor suggested that he overstate the volume of sales of Hoy at each hawker location. Smith replied that the distributor should instead fabricate bills from other hawking companies and tell the auditors that those non-existent companies had helped to distribute Hoy in Chicago. Smith explained that the distributor could blame the fictitious hawker companies for any hawkers and hawker locations that Tribune auditors could not confirm. The distributor did as Smith had instructed, setting up phony accounts in the names of other hawking firms, which he/she cited to Hoy as if they substantiated paid circulation numbers.

Because this one alleged incident apparently did not result in a large adjustment to circulation numbers or result in

- 25 -

discovery of the circulation scheme does not show that the
auditing program that was in place was so obviously deficient
that Tribune executives should have been aware of the
deficiencies. Without additional allegations as to existing or
missing controls, the scheme to inflate circulation that is
described does not make it obvious that it only went undiscovered
because there were insufficient controls. The fraudulent scheme
that is alleged is not a basis for strongly inferring that high
level Tribune executives should have known insufficient controls
were in place to reveal fraud. Cf. Svezzese v. Duratek, Inc.,
2002 WL 1012967 *5-6 (D. Md. April 30, 2002), aff'd by
unpublished order, 67 F. App'x 169 (4th Cir. 2003).

While the allegations that FitzSimons and Madigan
received additional bonuses based on increased cash flow shows
these two defendants had a possible motive for overstating
Tribune revenues, motivation is not by itself sufficient to infer
scienter. Tellabs, 437 F.3d at 601. Additionally, it is not at
all clear how much their bonuses were affected by the increased
advertising income resulting from inflated circulation figures
for two of Tribune's subsidiary newspaper holdings. The bonus
evidence is not even very strong evidence of motive. Cf.
Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1068-69
(5th Cir. 1994); Chu v. Sabratek Corp., 100 F. Supp. 2d 827, 841
(N.D. Ill. 2000). Also, the exercising of stock options that is

- 26 -

alleged is not a basis for inferring motive. There are no allegations regarding options activity outside the putative class period. Therefore, the allegations do not support that defendants' options activity during the putative class period was unusual or otherwise suspicious. Higginbotham, 2005 WL 1272271 at *8.

Even if the allegations are insufficient to support scienter prior to February 2004, lead plaintiff contends it is adequately alleged that scienter existed thereafter because the Tribune Individual Defendants were aware that the first advertisers' lawsuit had been filed. Awareness of the lawsuit does not establish that the Tribune Individual Defendants were turning a blind eye if they did not immediately accept the allegations of the lawsuit as true. The present allegations include that an investigation was begun, intermediate disclosures were made in June 2004, and full disclosures were made by September 2004. There are no allegations regarding any interim internal reports that were made that would have provided the Tribune Individual Defendants with information that was inconsistent with any of the press releases or SEC filings made between February and September 2004. Lead plaintiff points to the February 11, 2004 press release containing an absolute denial of the merits of the advertisers' lawsuit. But even if that press release should be attributed to one or more of the Tribune

- 27 -

Individual Defendants, as previously discussed, there is no sufficient basis for concluding that, as of that date, any of these defendants should have known that there was at least some truth to the allegations regarding inflated circulation numbers. Similarly, the fact that government agencies were instituting investigations is no basis for strongly inferring scienter on the part of the individual defendants. There are no specific facts alleged about the government investigations to support that, prior to September 2004, any particular Tribune Individual Defendant had knowledge to support scienter.

As to the further press releases and Form 10-Q from June and July 2004, no specific facts are alleged to support that, as of the dates of the particular statements, any Individual Tribune Defendant had or should have had knowledge that was inconsistent with facts contained in those statements.

Since plaintiffs have not alleged facts from which scienter on the part of the Tribune Individual Defendants can be strongly inferred, the First Claim as against those defendants will be dismissed.

## F. Tribune's Scienter

Still to be considered is whether scienter is adequately alleged regarding Tribune itself. As previously discussed, none of the Individual Tribune Defendants are adequately alleged to have had scienter. Therefore, scienter on the part of Tribune

cannot be based on any high level Tribune officer having the
necessary knowledge or intent. Lead plaintiff argues that
knowledge of any Tribune employee can be attributed to Tribune.
It argues that Tribune's scienter can be based on the Newsday-Hoy
Individual Defendants' knowledge that the circulation numbers
were being falsified. As previously discussed, there is no
sufficient basis for strongly inferring that Jansen knew the
Newsday circulation numbers were false or recklessly disregarded
the falsity of the circulation numbers. Therefore, any
attribution of knowledge or scienter must be based on one of the
other four Newsday-Hoy Individual Defendants.

        Contrary to lead plaintiff's contention, for purposes of
§ 10(b) liability, a corporation is not assumed to have the
knowledge of every single one of its employees no matter what the
employee's position may be. See Higginbotham, 2005 WL 1272271
at *8-9 (discussing cases). Instead, the corporation's scienter
is generally limited to being based on knowledge or scienter of a
senior officer or director of the corporation, or an employee
involved in issuing the alleged misrepresentation. Id. None of
the Newsday-Hoy Individual Defendants are senior officers or
directors of Tribune and, as previously discussed regarding their
individual liability, none (other than Jansen regarding one press
release) were involved in issuing any of the SEC filings or press
releases containing the alleged misrepresentations.

Lead plaintiff contends that these defendants can be considered to be spokespersons for Tribune in that they were authorized to provide circulation numbers to ABC. That, however, does not make them spokespersons as to the false statements that constitute the alleged violations of § 10(b). While senior Tribune officers and other unspecified Tribune employees relied on the Newsday-Hoy Individual Defendants for the circulation figures they reported in SEC filings and press releases, it was incumbent on lead plaintiff to adequately allege that those responsible for the SEC filings and press releases recklessly relied on the circulation figures that were provided. There are no allegations specifying who at Tribune issued the press releases. Lead plaintiff cannot simply attribute to Tribune the knowledge of lower level employees who were not also responsible for the SEC filings and press releases. Since Tribune's scienter is not adequately alleged, the First Claim against Tribune will be dismissed.

## G. Conclusion

The First Claim will be dismissed in its entirety. Since lead plaintiff has not adequately alleged the direct liability of any defendant, the Second Claim as to controlling person liability must also be dismissed. Higginbotham, 2005 WL 1272271 at *10. The Securities Case will be dismissed with prejudice. Class certification will be denied without prejudice.

- 30 -

## II. ERISA CASE

Two motions to dismiss have been filed in the ERISA Case. One is brought by all defendants and addresses issues generally applicable to all defendants. The other motion is brought by particular defendants.

### A. Pleading Standard

In the CAEC (Consolidated Amended Erisa Complaint),[9] it is expressly stated that: "Plaintiffs do not allege fraud in this action, but only breaches of fiduciary duty and ERISA violations." CAEC ¶ 162. Assuming the actual allegations and contentions are consistent with this statement, Fed. R. Civ. P. 9(b) does not apply to the claims contained in the CAEC. On defendants' motion to dismiss, plaintiffs' well-pleaded allegations of fact are taken as true and all reasonable inferences are drawn in plaintiffs' favor. Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164, (1993); Dixon v. Page, 291 F.3d 485, 486 (7th Cir. 2002). The CAEC need not set forth all relevant facts or recite the law; all that is required is a short and plain statement showing that plaintiffs are entitled to relief. Fed. R. Civ. P. 8(a)(2);

---

[9]Counsel for the ERISA plaintiffs have failed to comply with the requirement that, in addition to electronically filing pleadings, paper copies of complaints, motions, briefs, and other pleadings must be provided to the judge assigned to the case. See N.D. Ill. Loc. R. 5.2(e). Counsel shall make sure to comply with this requirement in the future.

Boim v. Quranic Literacy Institute, 291 F.3d 1000, 1008 (7th Cir. 2002); Anderson v. Simon, 217 F.3d 472, 474 (7th Cir. 2000), cert. denied, 531 U.S. 1073 (2001). Plaintiffs need not plead facts; conclusions may be pleaded as long as defendants have at least minimal notice of the claim. Fed. R. Civ. P. 8(a)(2); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002). Even if not required to plead specific facts, plaintiffs can plead themselves out of court by alleging facts showing there is no viable claim. See Slaney v. The International Amateur Athletic Federation, 244 F.3d 580, 597 (7th Cir.), cert. denied, 534 U.S. 828 (2001); Kauthar SDN BHD v. Sternberg, 149 F.3d 659, 670 & n.14 (7th Cir. 1998), cert. denied, 525 U.S. 1114 (1999). As long as they are consistent with the allegations of the CAEC, plaintiffs may assert additional facts in their response to the motion to dismiss. Brokaw v. Mercer County, 235 F.3d 1000, 1006 (7th Cir. 2000); Forseth v. Village of Sussex, 199 F.3d 363, 368 (7th Cir. 2000). Plaintiffs are not bound by legal characterizations of their claims contained in the CAEC. Forseth, 199 F.3d at 368; Kirksey v. R.J. Reynolds Tobacco Co., 168 F.3d 1039, 1041 (7th Cir. 1999). However, in response to a motion to dismiss that raises the issue, plaintiffs must identify a legal basis for a claim and make adequate legal arguments in support of it. Kirksey, 168 F.3d at 1041-42; Stransky v. Cummins Engine Co., 51 F.3d 1329, 1335 (7th Cir. 1995).

## B. Claims and Defendants

The ERISA Case concerns investments in Tribune stock by
two ERISA benefit plans[10] that are offered to particular Tribune
employees, the Tribune Company 401(k) Savings Plan ("TS Plan")[11]
and the Times Mirror Savings Plus Plan ("TM Plan"). The TM Plan
is limited to employees of Times Mirror and its subsidiaries,
which merged into Tribune in 2000. Both Plans are defined
contribution plans that provide individual accounts for
participants. See 29 U.S.C. § 1002(34). Participants have a
choice of investing their money in one or more of ten different
funds. Nine of the funds are third-party, publicly-traded mutual
funds. The other fund for each Plan is a fund that is required
to invest almost entirely in Tribune common stock, the Company
Stock Fund. The Company Stock Fund for each Plan had been an
Employee Stock Ownership Plan ("ESOP") before being merged into

---

[10]Portions of the Plans are quoted in the CAEC, but the
Plans themselves are not attached as exhibits. Defendants have
provided copies of the Plans and plaintiffs do not dispute that
they are accurate copies. Since central to plaintiffs' claims,
the Plans may be considered on the motion to dismiss.
Rosenblum v. Travelbyus.com Ltd., 299 F.3d 657, 661 (7th Cir.
2002); Duferco Steel Inc. v. M/V Kalisti, 121 F.3d 321, 324 n.3
(7th Cir. 1997); Venture Associates Corp. v. Zenith Data Systems
Corp., 987 F.2d 429, 431 (7th Cir. 1993). If inconsistent with
allegations of the CAEC, the actual documents will control. See
Rosenblum, 299 F.3d at 661 (quoting 5 Wright & Miller, Federal
Practice & Procedure Civil 2d § 1327 at 766 (1990)); In re Wade,
969 F.2d 241, 249 (7th Cir. 1992); Beam v. IPCO Corp., 838 F.2d
242, 244-45 (7th Cir. 1988).

[11]Prior to 2004, the TS Plan's name was the Tribune
Company Savings Investment Plan.

the TS and TM Plans.  Plaintiffs contend that defendants breached their fiduciary duties by continuing to have the Company Stock Fund for each Plan invest in Tribune stock despite the value of that stock being inflated by overcharging for advertising based on the inflated circulation numbers.

Allegedly, defendants should have known that the value of Tribune stock was artificially inflated and acted negligently by failing to reasonably investigate information regarding Tribune stock, failing to ensure there were adequate internal controls, and failing to keep participants adequately informed.

A jurisdictional issue raised by defendants-- surprisingly, in the last footnote of their brief--is whether plaintiffs' claims are cognizable under 29 U.S.C. § 1132(a)(2). Because this goes to plaintiffs' standing to bring their claims, it is a jurisdictional issue.  <u>Mutual Life Insurance Co. of New York v. Yampol</u>, 840 F.2d 421, 423 (7th Cir. 1988); <u>Bona v. Barasch</u>, 2003 WL 1395932 *9 (S.D.N.Y. March 20, 2003).

Courts are split regarding whether this section can be a basis for relief when the relief will not benefit all participants of the fund or the plan itself.  Here, relief will be limited to participants who had monies invested in the Company Stock Fund during a specific time period.  Presumably, at least some participants did not.  The Seventh Circuit has not yet ruled on this issue.  This court adopts the view that plaintiffs may

bring § 1132(a)(2) claims under the circumstances of this case. See Rogers v. Baxter International, Inc., 417 F. Supp. 2d 974, 980-82 (N.D. Ill. 2006). Plaintiffs may also be entitled to relief under § 1132(a)(3). See id. at 982-83. No claim will be dismissed for lack of jurisdiction.

There are three categories of defendants in the ERISA case. The Tribune Company Employee Benefits Committee (the "EBC") is named as a defendant as well as eleven current or former members of the EBC (the "Committee Defendants"). Each Plan names the EBC as a fiduciary and empowers the EBC to administer the Plans and establish and administer an investment policy. Thirteen defendants are members of the Tribune Board of Directors (the "Board Defendants"). The Board is responsible for appointing members of the EBC. The Board is specifically named as a fiduciary of the TS Plan. Also named as a defendant is Tribune itself. Tribune is alleged to be a de facto fiduciary of the Plans in that it employs and directs the people who make investment decisions for the Plans.

The CAEC contains three claims. The First Claim is against all defendants for breaches of fiduciary duty, including cofiduciary duties, citing 29 U.S.C. §§ 1104, 1109, 1132.[12] The breach is described as an imprudent investment claim. The Second

_____

[12]Although 29 U.S.C. § 1105 is not expressly cited in the First Claim, plaintiffs expressly refer to cofiduciary liability. See CAEC ¶ 169.

- 35 -

Claim is against all defendants for breach of fiduciary duty, including cofiduciary duties, citing 29 U.S.C. §§ 1104, 1105, 1109, 1132. The breach is negligent misrepresentations and omissions arising out of a duty to investigate and discover the circulation fraud. The alleged communications containing inaccurate information included summary plan descriptions that incorporated SEC filings. These are generally the same SEC filings that are alleged in the Securities Case. See § I(C) supra. Other alleged communications concerned options for participants' investment of the funds in their Plan accounts, in which the strong performance of Tribune stock was highlighted. Particularly, one such communication included a cover letter from FitzSimons addressed to "Fellow Employee" and boasting that 2003 "was one of great progress for Tribune Company, including achieving record earnings." CAEC ¶ 120. The Third Claim is against the Tribune and Board Defendants for breach of fiduciary duty, citing 29 U.S.C. §§ 1104, 1109, 1132. The breach is captioned as "Failure to Properly Appoint, Monitor and Inform the Committee Defendants."

## C. First Claim

Defendants' principal argument is that, as fiduciaries of the Plans, they had no duty to question the valuation of Tribune stock by conducting an independent inquiry into the circulation figures provided by Newsday and Hoy. Defendants contend this is

especially true since, in accordance with 29 U.S.C. § 1104(a)(2), the Company Stock Funds were exempt from ERISA's diversity requirement and a presumption arises that it was prudent to continue to limit the funds' investments to Tribune stock. See Wright v. Oregon Metallurgical Corp., 360 F.3d 1090, 1097-98 (9th Cir. 2004). See also Summers v. State Street Bank & Trust Co., 453 F.3d 404 (7th Cir. 2006). Defendants also point out that the circulation figures were already being independently audited by ABC and that the Tribune itself responded to reports by investigating the circulation fraud and took corrective action.

The express terms of both Plans require that an available investment option be a fund primarily consisting of Tribune stock. Therefore, the § 1104(a)(2) exception applies and defendants ordinarily would not be required to diversify the Company Stock Funds. See Wright, 360 F.3d at 1093-94. However, § 1104(a)(2) and language of a plan cannot "be interpreted to include a per se prohibition against diversifying an ESOP." Summers, 453 F.3d at 407 (quoting Kuper v. Iovenko, 66 F.3d 1447, 1457 (6th Cir. 1995)).[13] A fiduciary responsible for investing plan funds still has a duty of prudent investment that can

_____

[13]Defendants cite the dictum in Wright, 360 F.3d at 1097-98, suggesting that it is inconsistent with the language of § 1104(a)(2) to ever require that a fiduciary diversify a plan that is governed by that subsection. The Seventh Circuit's recent decision in Summers makes clear that the Seventh Circuit has not taken that position.

override plan restrictions and § 1104(a)(2) in special circumstances. <u>Summers</u>, 453 F.3d at 407. On this subject, the Seventh Circuit has favorably cited standards set forth by the Sixth Circuit in <u>Kuper</u> and the Third Circuit in <u>Moench v. Robertson</u>, 62 F.3d 553, 571-72 (3d Cir. 1995), <u>cert. denied</u>, 516 U.S. 1115 (1996). <u>See Summers</u>, 453 F.3d at 410. <u>Moench</u> holds that a fiduciary's decision not to diversify assets of a plan covered by § 1104(a)(2) is presumed to be proper and that presumption can only be overcome by showing an abuse of discretion. 62 F.3d at 571. "In attempting to rebut the presumption, the plaintiff may introduce evidence that 'owing to circumstances not known to the settlor and not anticipated by him [the making of such investment] would defeat or substantially impair the accomplishment of the purposes of the trust.'" <u>Id.</u> (quoting <u>Restatement (Second) of Trusts</u> § 227 cmt. g (1957)). Similarly, <u>Kuper</u> holds "the plaintiff must show that the ERISA fiduciary could not have reasonably believed the plan's drafters would have intended under the circumstances that he continue to comply with the ESOP's direction that he invest exclusively in employer securities." <u>Kuper</u>, 66 F.3d at 1459 (quoted in <u>Summers</u>, 453 F.3d at 410). The Seventh Circuit's discussion of the issue has also made clear that investment risk, not stock price decline, is the key consideration, <u>see Summers</u>, 453 F.3d at 408-11, including whether the participants' retirement funds are

almost entirely invested in the company's stock or there are
other assets besides the company stock, see id. at 410-11.

It is expressly alleged in the CAEC that investment in
the Company Stock Fund is one option a participant may choose,
not the only option. There are also express allegations
regarding the percentage of Plan assets that participants had
invested in the Company Stock Fund. As of December 31, 2003, 61%
of the TS Plan's assets and 23% of the TM Plan's assets were in
the Company Stock Fund.[14] The distribution of total assets of
the Plans, however, does not establish exactly how individual
participants allocated their accounts.

Citing In re Westar Energy Inc., ERISA Litigation, 2005
WL 2403832 (D. Kan. Sept. 29, 2005); In re Dynegy, Inc. ERISA
Litigation, 309 F. Supp. 2d 861 (S.D. Tex. 2004), and Barker v.
American Mobil Power Corp., 64 F.3d 1397 (9th Cir. 1995),
defendants contend ERISA imposed no duty upon them to
independently inquire about, investigate, or audit company
affairs or reports potentially affecting its stock value.
Defendants concede, however, that so-called "red flags" will
create such a duty. Essentially, that is the theory relied upon
by plaintiffs. They contend that internal controls for

---

[14]In the CAEC, plaintiffs cite to the plans' 2003 Forms
11-K, but do not attach them to the CAEC. Defendants provide the
Forms 11-K for 2004 which show that, as of December 31, 2004, the
respective percentages were 59% for the TS Plan and 32% for the
TM Plan.

- 39 -

circulation were so obviously deficient that defendants would
have known the circulation figures could not be relied upon.
Thus, it is alleged that defendants should have known circulation
was overstated and, correspondingly, advertising revenues were
inflated. Although not expressly alleged, it is implied that,
had they recognized the internal control deficiencies, defendants
would have also realized the inflated numbers would eventually
become public, resulting in a need both to refund past
advertising charges and decrease future advertising rates, and
ultimately resulting in a charge to past income and decrease in
future income. For present purposes, it will be assumed that
obviously deficient internal controls and the corresponding
implications as to an effect on company income would be a "red
flag" putting defendants on notice. Plaintiffs do not detail the
alleged control deficiencies. It must be considered whether the
conclusory allegation as to obvious control deficiencies and
their implications is sufficient to support plaintiffs' claims.

Unlike the Securities Case in which the PSLRA and Rule
9(b) apply, Rule 8(a) applies to the ERISA case. Rule 8(a)
still requires that the claim be adequately described so as
to fairly notify defendants as to the claims against each of
them. Wilson v. Advocate Health and Hospitals Corp., 2006 WL
1749662 *3 (N.D. Ill. June 21, 2006); Ward v. Independent Order
of Foresters, 2006 WL 571874 *2 (S.D. Ind. March 7, 2006). In

the present type of case, case law supports that conclusory allegations that all defendants should have known pertinent facts about the corporation generally have not been found to be sufficient unless it is, at a minimum, alleged that each particular defendant was in a position to know or to learn the information. Thus, allegations a defendant was a director or officer of the corporation, or an employee in a particular position, will generally suffice to support that the defendant should have known certain related information transacted at Board level; but alleging that a defendant was a member of a plan's investment committee, without more, is generally insufficient to take as true that the defendant should have known specific information about the operations of the corporation that sponsors the plan. See Howell v. Motorola, Inc., 337 F. Supp. 2d 1079, 1089-91 (N.D. Ill. 2004) (collecting cases); In re Ferro Corp. ERISA Litigation, 422 F. Supp. 2d 850, 861 (N.D. Ohio 2006); Rogers, 417 F. Supp. 2d at 984; In re Sears, Roebuck & Co. ERISA Litigation, 2004 WL 407007 *5 (N.D. Ill. March 3, 2004). But compare Herrington v. Household International, Inc., 2004 WL 719355 *4-5 (N.D. Ill. March 31, 2004). Also, plaintiffs may plead themselves out of court by providing specific allegations that are inconsistent with conclusory allegations. Slaney, 244 F.3d at 597; Wright, 360 F.3d at 1098.

As to the Committee Defendants, it is generally alleged that they "were all senior Tribune management personnel who should have been intimately aware of Tribune's financial condition and business practices and internal controls and should have known about the Tribune circulation scandal and other facts alleged" in the CAEC. CAEC ¶ 32. That general allegation, however, is inconsistent with allegations that two Committee defendants were the Director of Benefits and Senior Vice President of Human Resources. Also, a number of Committee Defendants are simply alleged to be Vice Presidents of Tribune, without identifying those positions as being related to circulation or finance. The allegations are insufficient to take as true that these defendants should have known internal controls for circulation in a subsidiary were deficient.

As to those defendants who are alleged to be Directors, high-level Tribune Officers, or Tribune officials in the Finance or Treasurer's offices, the allegations are also insufficient. Tribune is alleged to be one of the country's largest media and entertainment companies. The publishing segment allegedly represents more than 70% of Tribune's total revenues, which exceeded $5 billion annually in recent years. Operating profits during the three years preceding the filing of the CAEC ranged from $800 million to $1.3 billion, with 65% coming from the publishing segment. CAEC ¶ 92. Newsday and Hoy are owned by

subsidiaries and are just two of a number of newspapers owned by Tribune. Allegations in the CAEC indicate the Tribune owns at least 14 newspapers. See CAEC ¶ 130 (quoting a June 21, 2004 Bloomberg article). Even with income inflated by overstated circulation figures, Newsday revenues for 2002 were about $602 million, which represented 15.6% of Tribune's publishing revenues and approximately 12% of total revenues. CAEC ¶ 103. Newsday was not Tribune's largest newspaper, the Chicago Tribune, the Los Angeles Times, and the Baltimore Sun also being owned by Tribune subsidiaries. And Hoy was substantially smaller, having circulation one-seventh or less that of Newsday.

While it is alleged that circulation controls at the two newspapers were weak, the only specific allegation is that circulation managers were not required to certify the amount of claimed circulation. CAEC ¶ 93. Unlike the SAC in the Securities Case, the CAEC does not detail the fraudulent conduct of the Newsday and Hoy employees who were directly perpetrating the overstatement of circulation. However, it is still alleged that employees had distributors pad sales figures, that retailers were paid to dump papers, and a computer program was created to falsify sales. Id. ¶ 129 (quoting a June 2004 article from the Chicago Sun-Times). In light of the allegedly fraudulent attempt to inflate circulation and cover up the inflation, it would not have been obvious for an outsider to discover figures were

- 43 -

inflated, and even more difficult to determine the true numbers. None of the defendants in the ERISA Case are alleged to have been directly involved in the fraudulent reporting of circulation. After accusations, ABC conducted an audit, found a lack of sufficient records, and took more time than expected to be able to complete the audit. Previously, though, ABC had audited Newsday's and Hoy's circulation reports without finding any problems. It was only, after accusations, that ABC investigated intensively enough to discover a problem. According to the CAEC, in response to the first advertiser's lawsuit, Tribune also conducted its own investigation, which, within a few months, uncovered circulation overstatements.

None of the individual defendants in the ERISA Case are alleged to have been employed by Newsday or Hoy. Instead, all the individual defendants are employees and/or Directors of the parent company, Tribune. While significant assets, Newsday and Hoy represent only about 12% of company revenues. Also, Tribune is alleged to have a number of larger newspaper and other media holdings. Those allegations are inconsistent with any of the individual defendants having intimate knowledge of operations at Newsday and Hoy. The facts alleged are inconsistent with any of the individual defendants having knowledge that would have made it obvious that Newsday and Hoy had insufficient internal controls for circulation. Lacking such knowledge, there would be

no basis for any individual defendant's conduct being negligent. Since none of the individual defendants would have known of the deficient controls, there is no sufficient basis for attributing such putative knowledge to the EBC itself or the Tribune.[15]

Even if the conclusory allegations that defendants should have known circulation was overstated at Newsday and Hoy were to be taken as true, defendants contend the First Claim should be dismissed because plaintiffs have not alleged a sufficient decline in stock price or a sufficiently serious deterioration of Tribune's financial situation accompanied by a genuine risk of insider trading. See Wright, 360 F.3d at 1098-99 (citing Moench, 62 F.3d at 572; LaLonde v. Textron, Inc., 270 F. Supp. 2d 272, 280 (D.R.I. 2003), aff'd in part, vacated in part, 369 F.3d 1 (1st Cir. 2004)). While Wright stands for the proposition that those are two principal factual grounds for overcoming the presumption, Wright does not hold that these are the only possible factual grounds for overcoming the presumption. Moreover, in Summers, 453 F.3d at 407-11, the Seventh Circuit discussed other possible scenarios that would support finding that the ERISA fiduciaries had violated the duty of prudence.

---

[15]Tribune also contends all claims against it should be dismissed because the Plans do not formally make it a fiduciary. Case law, however, supports that persons or entities can act as "de facto" or "functional" fiduciaries. See In re Luna, 406 F.3d 1192, 1202 (10th Cir. 2005); Rogers, 417 F. Supp. 2d at 986. Plaintiffs have adequately alleged that Tribune is a de facto fiduciary. See CAEC ¶¶ 71-74; Rogers, 417 F. Supp. 2d at 986.

But even viewing the possible scenarios for imprudent investment more broadly than defendants do, plaintiffs' First Claim does not withstand scrutiny.

Even assuming that non-negligent conduct would have resulted in defendants having full knowledge of the overstatements of circulation and the potential for a $95 million charge to income,[16] prudence did not require selling off the Plans' Tribune stock and closing the Company Stock Fund. As is alleged in the CAEC, the Tribune's annual revenues exceed $5 billion. The charge to income, which represents refunds or credits to advertisers from at least three different years, represents less than 2% of Tribune's revenues for a single year. While such a loss of revenue could be expected to affect dividends and/or the value of the company's stock, it would not be expected to put the company at risk of going out of business, which was the pertinent scenario in Summers.

In the present case, the pertinent scenario is whether it would be imprudent to permit continued investment in a stock because of an expected revelation that could be expected, at least in the short term, to drop the value of the stock. See, e.g., Sears, 2004 WL 407007 at *4 (allegation that continued

---

[16]A September 10, 2004 article in Bloomberg reported that Tribune officials indicated there would be a total charge of up to $95 million. CAEC ¶ 143. In October 2004, it was disclosed that the actual charges had been determined to total $90 million. Id. ¶ 146.

investment in company stock fund was imprudent was sufficient where the plan's investment committee knew or should have known information that, when disclosed, resulted in a 30% drop in the value of the company's stock). Plaintiffs have alleged a 25% drop in the value of Tribune's stock, which they conclusorily attribute to the revelation of the overstatement of circulation. CAEC ¶ 154. Such an allegation, however, is incredible in light of the allegation that correcting the circulation figures only resulted in a corresponding adjustment to revenues representing less than 2% of one year's revenues. Moreover, the conclusory allegation is inconsistent with other allegations in the CAEC. According to the CAEC, Tribune stock was selling for approximately $52.00 as of February 2004 when the first advertisers' lawsuit was filed. There is, however, no allegation that the advertisers' lawsuit drew much public attention nor affected the stock's value. Instead, it is alleged that the truth began to emerge on June 17, 2004. By June 16, the stock's value had already dropped to $46.78.[17] Despite the June 17 revelation, the stock closed higher at the end of the day ($47.27). On June 18, the price dropped back to $46.81, nearly

---

[17]The CAEC does not contain allegations as to the stock's price in June 2004 or November 2004. For the dates in June and November 2004, judicial notice is taken of the sales price of the stock. Facts taken by judicial notice, including the selling price of publicly traded stocks, may be considered on a motion to dismiss. Takara Trust v. Molex Inc., 429 F. Supp. 2d 960, 963 (N.D. Ill. 2006).

the same level as June 16. Plaintiffs focus on July 15, 2004 as the date the Tribune began to more fully disclose the overstatements. On that date, an expected charge of $35 million dollars was announced and the stock price dropped from $43.12 to $42.00, a 2.6% drop. CAEC ¶ 138. On September 10, 2004, an announcement was made indicating there would be a total charge of $95 million. Id. ¶ 143. On September 13, 2004, Tribune stock closed at $39.72. Id. ¶ 145. Although, it is alleged that the stock dropped to $35.00 by the end of 2004, there is no allegation that additional charges to income were anticipated. As defendants point out, as of November 30, 2004, the stock had risen to $43.37, above the July 15 price, even though there had been additional disclosures regarding circulation adjustments, but no additional reports of charges to income. The drop in price from July 15 to September 13 was $3.40, representing 7.9% of the July 15 price. Plaintiffs do not allege any disclosures in December 2004 that would have tied the $8.37 decline during that month to the circulation overstatements.

On a motion to dismiss, the actual causes of changes in the price of Tribune stock cannot be determined. However, plaintiffs' allegation that the disclosure of circulation figures caused a 25% drop in 2004 is completely inconsistent with a one-time 2% effect on income and the price fluctuations that occurred at the times particular announcements were made. If the actual

fluctuations in stock prices were the only pertinent facts to consider, the allegation that continued investment was imprudent would have to be rejected. Looking only at revelations and stock prices, the November 30, 2004 price shows that the stock fully recovered from the key revelations. No further negative effect on Tribune's reported income occurred thereafter. Therefore, it would have been imprudent to completely divest prior to the key disclosures beginning July 15, 2004.

The analysis based on fluctuations in price of Tribune stock is based on hindsight. It assumes that the stock price changes that actually occurred reflect what defendants should have foreseen beforehand. Had defendants looked beyond the reported circulation figures, though, at best--which still involves some clairvoyance--they would have known ahead of time that Tribune's reported revenues would be expected to take a $90-95 million hit. As noted, that represents less than 2% of a single year's revenue for the Tribune. While a short-term impact of a limited degree could be expected from such a revelation, it is not one that would threaten the viability of the company. This is not a sufficient impact on the company to overcome the presumption in favor of following the Plans' express requirements to include a Company Stock Fund as an option for participants.

As the Court of Appeals states in Summers:

[D]etermining the "right" point, or even range of "right" points, for an ESOP fiduciary to break

- 49 -

the plan and start diversifying may be beyond the practical capacity of the courts to determine. The Department of Labor pamphlet that we cited earlier states that a directed trustee may have a duty to sell "where there are clear and compelling public indicators, as evidenced by an 8-K filing with the Securities and Exchange Commission (SEC), a bankruptcy filing or similar public indicator, that call into serious question a company's viability as a going concern." U.S. Dept. of Labor, supra, at 5-6. That is not an administrable standard; note the hedge in "may" and the fact that selling when bankruptcy is declared will almost certainly be too late.

453 F.3d at 411.

The First Claim will be dismissed in its entirety for two sufficient reasons. One, the allegations do not support that any defendant should have known about the circulation problems. Two, the facts alleged do not support that defendants acted imprudently by not discontinuing the Company Stock Fund.

### D. Second Claim

As to the Second Claim, defendants contend that (1) it cannot be based on SEC filings and other statements that defendants made in their corporate capacities, not their ERISA fiduciary capacities; (2) they had no duty to disclose; and (3) it is not alleged that defendants had the necessary information or that they could have discovered it.

Defendants argue that the SEC filings and some of the other communications allegedly containing the misrepresentations and omissions cannot be a basis for the Second Claim because they

were communications made in defendants' corporate capacities, not their fiduciary capacities. This is an argument that goes to only a portion of the Second Claim. Plaintiffs also base the Second Claim on communications particularly pertaining to the plans. In any event, cases consistently hold that incorporating SEC filings into summary plan descriptions of ERISA plans makes the statements in the SEC filings statements made in the fiduciaries' ERISA capacity. See, e.g., Gee v. UnumProvident Corp., 2005 WL 534873 *16 (E.D. Tenn. Jan. 13, 2005); In re AEP ERISA Litigation, 327 F. Supp. 2d 812, 825 (S.D. Ohio 2004); In re WorldCom, Inc., 263 F. Supp. 2d 745, 766-67 (S.D.N.Y. 2003); Rankin v. Rots, 278 F. Supp. 2d 853, 876 (E.D. Mich. 2003) (quoting Worldcom, supra). Defendants cite no case to the contrary.[18] The facts alleged in the CAEC are not sufficient to conclusively determine any particular alleged communication was made solely in a defendant's capacity as a corporate officer.

The second contention also goes to only part of the Second Claim. Plaintiffs allege both the nondisclosure of information and negligent misrepresentations. This contention does not apply to the latter. Moreover, plaintiffs do not appear

[18]Defendants cite WorldCom, 263 F. Supp. 2d at 760. This particular holding in WorldCom is that, when SEC filings are incorporated in plan documents, simply signing SEC filings does not make a corporate officer a fiduciary of the plan. However, if a corporate officer is otherwise a fiduciary of the ERISA plan, he or she will be responsible, in his or her capacity as a plan fiduciary, for SEC filings incorporated in the plan's summary plan description. Id. at 766.

to be claiming that defendants should have made independent disclosures regarding the overvaluation of Tribune stock. To the extent plaintiffs allege omissions, they are alleging that facts were omitted from documents that otherwise addressed the issue of investing in the Company Stock Funds. The law is clear that, when a fiduciary makes statements to participants, those statements must be full and accurate and cannot be misleading. Bowerman v. Wal-Mart Stores, Inc., 226 F.3d 574, 590 (7th Cir. 2000); In re Enron Corp. Securities, Derivative & "ERISA" Litigation, 284 F. Supp. 2d 511, 557 (S.D. Tex. 2003). Also, the distinction between a misleading affirmative representation and a misleading omission is not always clear. There is case law supporting that ERISA fiduciary breaches can be based on negligent failures to disclose information that the fiduciary should have known. See James v. Pirelli Armstrong Tire Corp., 305 F.3d 439, 449 (6th Cir. 2002), cert. denied, 538 U.S. 1033 (2003); Griggs v. E.I. DuPont de Nemours & Co., 237 F.3d 371, 381 (4th Cir. 2001); Enron, 284 F. Supp. 2d at 559. Some courts have emphasized that special circumstances are required for an affirmative duty to disclose. See In re Syncor ERISA Litigation, 351 F. Supp. 2d 970, 987 (C.D. Cal. 2004); Hill v. BellSouth Corp., 313 F. Supp. 2d 1361, 1369 (N.D. Ga. 2004). For plans involving investment in the employer's stock, there is no general duty to continuously disclose information about the financial

condition of the employer.  See Herrington, 2004 WL 719355 at
*7-8.  More importantly, the Second Claim is subject to dismissal
on another ground.  Therefore, this particular issue will not be
resolved at this time.  Cf. AEP, 327 F. Supp. 2d at 832; In re
Xcel Energy, Inc., Securities, Derivative & ""ERISA"" Litigation,
312 F. Supp. 2d 1165, 1182 (D. Minn. 2004).

As is discussed above in § II(C), the alleged facts do
not support that defendants should have known that the reported
circulation figures were overstated.  Therefore, the allegedly
inaccurate representations made by defendants were not negligent.
The Second Claim will be dismissed in its entirety.

### E. Third Claim

The Third Claim is against the Tribune and Board
Defendants for failing to adequately monitor the EBC, the members
of which had been appointed by the Tribune/Board Defendants.
Allegedly,

> Tribune and the Board Defendants breached
> their fiduciary monitoring duties by, among other
> things, (a) failing to ensure that the monitored
> fiduciaries had access to knowledge about
> Tribune's true circulation figures, and
> (b) failing to ensure the monitored fiduciaries
> appreciated and accurately communicated the huge
> risk of significant investment by rank and file
> employees in the Fund.  Tribune and the Board
> Defendants should have known that the fiduciaries
> they were responsible for monitoring were
> imprudently allowing the Plans to continue
> offering the Fund, and continuing to invest the
> Plans' assets in the Fund when it was not prudent
> to do so, yet failed to take action to disclose

to Participants or otherwise protect them from
the consequences of these fiduciaries' failures.

CAEC ¶ 188.

Defendants do not dispute that fiduciaries who appoint
fiduciaries of an ERISA plan have a duty to periodically monitor
the appointees "to ensure that their performance has been in
compliance with the terms of the plan and statutory standards,
and satisfied the needs of the plan." In re Cardinal Health,
Inc. ERISA Litigation, 424 F. Supp. 2d 1002, 1047 (S.D. Ohio
2006) (quoting 29 C.F.R. § 2509.75-8). However, the focus of
plaintiffs' allegations (as well as their arguments in response
to the motion to dismiss) are that the Tribune/Board Defendants
breached their duty to monitor by failing to disclose information
regarding the inflated circulation numbers and the related
inflation of Tribune stock prices. Defendants contend the duty
to monitor does not include a duty to disclose. Alternatively,
to the extent there is a duty to disclose, defendants contend it
is limited to facts for which the appointing fiduciary has actual
knowledge, but they are not alleged to have had actual knowledge
of the inflated circulation figures and stock prices.

Herrington, 2004 WL 719355 at *9, held that the duty to
monitor does not include the duty to disclose nonpublic
information to the appointee. In Herrington, this holding
was based on the conclusion that 29 U.S.C. § 1104's duty of

- 54 -

disclosure does not extend to plan fiduciaries being required to disclose such information to participants. See id. at *8-9. Courts that have actually considered the issue, however, hold that the duty to monitor also includes the duty to disclose information. See Woods, 396 F. Supp. 2d at 1373-74 & n.13 (collecting cases). This duty to disclose has not been extended beyond information for which the appointing authority has actual knowledge. See Ferro, 422 F. Supp. 2d at 863 ("knew that the Company Fund was no longer a prudent investment option"); Woods, 396 F. Supp. 2d at 1374 ("material information within the appointing fiduciary's knowledge"); In re Polaroid ERISA, 362 F. Supp. 2d 461, 477 (S.D.N.Y. 2005) ("all Defendants . . . had knowledge of facts which should have caused them to question the prudence of continued investment in Polaroid common stock"); Sears, 2004 WL 407007 at *8 ("had knowledge of the accounting irregularities"); Worldcom, 263 F. Supp. 2d at 765 ("material information he had regarding the prudence of investing in WorldCom stock"). The majority rule will be followed.

Although plaintiffs have not alleged defendants had actual knowledge of the inflated circulation numbers and stock price, it is claimed that they were aware of obvious deficiencies in internal controls at Newsday and Hoy. As discussed above in § II(C), the facts alleged do not support that the Tribune and

Board Defendants were aware of obvious deficiencies in internal controls. Therefore, the Third Claim will be dismissed.

### F. Conclusion

Since all the claims are otherwise subject to dismissal, it is unnecessary to consider additional issues that defendants raise regarding particular defendants. The ERISA Case will be dismissed in its entirety. Class certification will be denied without prejudice.

IT IS THEREFORE ORDERED that:

(1) In Case No. 06 C 741: Plaintiff's cause of action is dismissed without prejudice.

(2) In case No. 05 C 2602: Lead plaintiff's motion to consolidate, amend, and join two new defendants [93] is granted. Lead plaintiff is granted leave to file the Second Amended Consolidated Class Action Complaint. Lead plaintiff's requests for default [87, 88, 89] are denied. Defendants' motions to dismiss [63] are granted. Class certification is denied without prejudice. The Clerk of the Court is directed to enter judgment in favor of defendants and against lead plaintiff dismissing lead plaintiff's cause of action with prejudice.

(3) In Case No. 05 C 2927: Defendants' motions to dismiss [49, 54] are granted. Class certification is denied without prejudice. The Clerk of the Court is directed to enter

judgment in favor of defendants and against plaintiffs dismissing plaintiffs' cause of action with prejudice.

ENTER:

UNITED STATES DISTRICT JUDGE

DATED: SEPTEMBER 29 , 2006